■ In the Matter of NASSAU EDUCATIONAL CHAPTER OF THE CIVIL SERVICE EMPLOYEES ASSOCIATION, INC., et al., Respondents, v GREAT NECK UNION FREE SCHOOL DISTRICT, Appellant. — In a proceeding pursuant to CPLR article 78, *inter alia,* to compel the Great Neck Union Free School District to reinstate the individual petitioners to their positions, the appeal is from a judgment of the Supreme Court, Nassau County (Lockman, J.), entered July 1, 1980, which, after a nonjury trial, *inter alia,* granted the petition and ordered the reinstatement of the individual petitioners, with back pay. Judgment reversed, on the law, without costs or disbursements, and proceeding dismissed on the merits. The individual petitioners, former security guards employed by the Great Neck Union Free School District, bring this proceeding challenging the abolishment of their civil service positions and the contract entered into between the district and Star Security Systems which provides for security services formerly supplied by the individual petitioners, as being in violation of section 6 of article V of the New York State Constitution. That section provides, in pertinent part, that "[a]ppointments and promotions in the civil service of the state and all of the civil divisions thereof, including cities and villages, shall be made according to merit and fitness to be ascertained, as far as practicable, by examination which, as far as practicable, shall be competitive". After a nonjury trial on the issue of whether the district controlled Star's employees so as to amount to an employer-employee relationship between the district and Star's employees in violation of the State Constitution, Special Term granted the petition and directed that the individual petitioners be reinstated, with back pay. We reverse. The Constitution does not require that all governmental services be supplied by civil service employees, and contracts with private contractors have been permitted when they were legitimate attempts to have service provided in a more cost-efficient manner (see *Matter of Corwin v Farrell,* 303 NY 61, 66, 68; *Matter of Conlin v Aiello,* 64 AD2d 921, 922, affd 49 NY2d 713; *Matter of Westchester County Civ. Serv. Employees Assn. v Cimino,* 58 AD2d 869, 870, affd 44 NY2d 985). Where the private contracting party's employees are not independent of the government but are controlled and supervised by government officials, the contract will be struck down (see *Matter of Turel v Delaney,* 285 NY 16; cf. *Matter of Conlin v Aiello, supra,* p 922; *Matter of Westchester County Civ. Serv. Employees Assn. v Cimino, supra,* p 870). For example, in *Matter of Turel v Delaney (supra),* a contract between the then New York City Board of Transportation and a private physician for medical services for the board's employees was struck down as being in violation of section 6 of article V of the State Constitution,

where the contract provided for board approval of all those hired by the contractor and set the rate of compensation to be paid by the board for each of the contractor's employees. In other cases, contracts similar to the one at bar have been upheld even though provisions of the contract or bid specifications included clauses requiring minimum compensation for the contractor's employees, permitting the government to make reasonable directions or requests incidental to the performance of the contract, detailing the tasks to be performed by the contractor, permitting the government to issue rules and regulations governing the manner of performance and conduct of the contractor's employees, specifying the general time periods the contractor's services are required to facilitate a proper bid, and requiring the use of an affirmative action hiring policy (see *Matter of Corwin v Farrell,* 303 NY 61, *supra; Matter of Conlin v Aiello,* 64 AD2d 921, affd 49 NY2d 713, *supra; Matter of Westchester County Civ. Serv. Employees Assn. v Cimino,* 58 AD2d 869, affd 44 NY2d 985, *supra*). The above provisions did not amount to control of the contractor's employees. In this case, the district did not control the hiring of, and salaries for, Star employees as was the situation in *Matter of Turel v Delaney* (285 NY 16, *supra*). Although Special Term concluded that its findings of fact amount to proof of control over Star employees by the district's employees, an analysis of the facts leads us to the opposite conclusion. Star employees reported to the district security office (manned by district security personnel) at the beginning and end of their tours of duty. This procedure permitted the district's employees to verify the pay vouchers submitted by Star to the district by recording the times Star employees were on duty (cf. *Matter of Conlin v Aiello,* 64 AD2d 921, 923, *supra*). Star employees punched Star's time clock and received their assignments from a Star supervisor. Star supplied its employees with some equipment (e.g., uniforms) and the employees used other equipment the district had left over from its own security force as a matter of convenience and economy for both parties (e.g., vehicles and beepers). The fact that Star employees inform the district's security personnel when they go on a meal break does not amount to control. Permission is not requested by the Star employees and is not granted by the district's employees. It is a reasonable regulation governing the manner of performance so that the district employee who is manning the district's alarm system knows whether a Star security guard is available to investigate a potential problem (see *Matter of Westchester County Civ. Serv. Employees Assn. v Cimino,* 58 AD2d 869, 871, *supra*). Requests, rather than orders, from district security personnel to star employees to investigate and report on alarms received by the district's security system, to deliver district mail or to assist a district employee in directing traffic on school days, are reasonable requests incidental to the performance of the contract (see *Matter of Westchester County Civ. Serv. Employees Assn. v Cimino, supra,* p 870). The district's security office houses an elaborate alarm system connected to all of the district's buildings and manned by district employees. Informing Star employees when an alarm is received enables Star to perform its security function. Finally, Star employees were required to call into the district's security office if they could not come to work. This system was set up by Star's branch manager, who appointed a Star employee as an on-site supervisor. District security employees merely relay the message to the Star supervisor who provides for a replacement. Under all of these circumstances, we conclude that the district's relationship with Star employees does not amount to an employer-employee relationship so as to violate section 6 of article V of the State Constitution. Cohalan, Margett and Thompson, JJ., concur.

Lazer, J. P., dissents and votes to affirm the judgment, with the following memorandum, in which Rabin, J., concurs: The issue here is the legitimacy of

the Great Neck school district's effort to replace civil service personnel by employees of a private agency which contracted to provide security services for the district. In this article 78 proceeding, the discharged employees and their union assert that the district's action violates the civil service provision of the State Constitution (NY Const, art V, § 6) because the arrangement with the private agency masks an illegal scheme under which the new security guards remain under the direct control and supervision of the district. In determining whether the relationship with those who provide work or services is that of employer-employee or employer-independent contractor, the crucial test is whether the contracting party's employees are controlled and supervised by government officials (*Matter of Corwin v Farrell*, 303 NY 61; *Matter of Conlin v Aiello*, 64 AD2d 921, affd 49 NY2d 713; *Matter of Westchester County Civ. Serv. Employees Assn. v Cimino*, 58 AD2d 869, affd 44 NY2d 985). While the cited cases indicate that the factors to be considered include the authority to hire, fire, discipline and pay the employees and their Social Security and other taxes, the ultimate emphasis is upon the degree of control exercised by the governmental authority over the contractor's personnel (see *Matter of Corwin v Farrell, supra; Matter of Conlin v Aiello, supra; Matter of Westchester County Civ. Serv. Employees Assn. v Cimino, supra*). I find all of the cases cited by my colleagues of the majority to be distinguishable on their facts from the case before us now. In *Corwin*, the governmental authority merely contracted for a finished product, title examinations, and no employer-employee relationship existed with the title examiners. The factors which sustained the contractual scheme in *Matter of Westchester County Civ. Serv. Employees Assn.* included security guards who did not provide their services exclusively to the county, day-to-day control over the guards exerted by the contractor's supervisors, and the contractor who provided all required materials and equipment. In *Conlin*, the contractor supplied its own supervision and the board of education did not fix the hours of employment or control the terms and conditions of employment. The distinction between the employee-employer and the employer-independent contractor relationship has been said to be "the difference between one who undertakes to achieve an agreed result and to accept the directions of his employer as to the manner in which the result shall be accomplished, and one who agrees to achieve a certain result but is not subject to the orders of the employer as to the means which are used" (*Matter of Morton*, 284 NY 167, 172). To determine whether the degree of control and direction is such that the contractor's employees are *de facto* employees of the district, all aspects of the contracting arrangement must be scrutinized (see *Matter of Villa Maria Inst. of Music [Ross]*, 54 NY2d 691, 692). Mere examination of the agreement between the parties will not suffice (*Matter of Morton, supra*, p 175; *Matter of Klein v Sunrise Bldg. Co.*, 7 AD2d 805), for it is necessary to look behind the terms of the contract to determine the actual relationship (see *Matter of Lloyd [Sans Souci Realty Corp. — Catherwood]*, 32 AD2d 602). The facts thus become pivotal. Prior to October 15, 1978, the district maintained security by employing civil service personnel as guards. The guards provided round-the-clock coverage and were assisted on weekends and during special events by other part-time employees of the district. Supervisory authority over the guards was vested in three district employees who bore the title of Chief, Captain and Lieutenant. These officers assigned the shifts and posts of duty, checked the guards' uniforms, issued equipment, occasionally conducted field inspections and — perhaps most significantly — monitored the district's alarm systems and directed the guards to areas where alarms had signaled intrusion. The alarm system was electronic; in addition to the wiring of all buildings and windows, there also were audio devices which relayed the sound of any noises heard inside the building. The job of security

guard consisted of patrolling 16 district buildings in district vehicles, telephoning the security office from each building, and filing a daily report listing activities performed. If an alarm registered during a guard's patrol, he would investigate it in accordance with the directions of the monitoring officer who contacted him. The guards also directed traffic one hour each school day and occasionally delivered documents or transported people. Under the contract between the district and Star Security Systems, Inc., the entire scheme remained largely unaltered. The district retained the former Chief and Captain in the same posts (discharging only the Lieutenant) and the duties of the new guards were essentially identical to those of the fired district employees. The number of guards on each shift and the time and location of each patrol continued to be determined by the district officers, although Star assigned a specific guard to fill these predetermined posts. At the beginning and end of each shift, the guards reported to the district officers. If a guard did not seem fit for duty, the officer could refuse to assign him. As before, the guards patrolled the buildings, submitted reports to the Chief, directed traffic and delivered documents when required. The district continued to furnish radio cars, beepers and firefighting equipment, with Star furnishing uniforms which were nearly identical to the ones furnished by the district. Violation of a district officer's instructions subject the guards to discipline by Star. Star billed the district for the hours worked by the guards, but the accuracy of the bills was verified by utilization of the district officer's records. Star's pretence of supervision of the guards terminated shortly after it commenced performance of the contract. At the outset, calls involving the guards' performance, absences and other problems were made to Star's branch manager at home. Since such calls at late hours disturbed the manager's repose, this practice was discontinued and one of the guards patrolling a post was designated as an onsite supervisor. This "supervisor" was present during only one of three shifts and performed the usual functions of a security guard. He had no real supervisory authority and became merely a conduit for messages between the district officers and Star. As has been noted, whether the civil service mandate of the State Constitution is violated by a private contracting scheme turns on whether the contractor's employees are controlled and supervised by public officials (*Matter of Corwin v Farrell,* 303 NY 61, *supra; Matter of Conlin v Aiello,* 64 AD2d 921, affd 49 NY2d 713, *supra; Matter of Westchester County Civ. Serv. Employees Assn. v Cimino,* 58 AD2d 869, affd 44 NY2d 985, *supra).* On this record, it is apparent that the district controls the work and that it is performed in the manner directed by the district (see *Matter of Morton,* 284 NY 167, 172-173, *supra).* Star does not exercise discretion as to the mode, manner and details of the work (see *Matter of Cool [Ross],* 57 AD2d 450, affd 44 NY2d 750) nor does it provide any bona fide supervision for the job. The district furnishes almost all of the required equipment (see, e.g., *Matter of Glielmi v Netherland Dairy Co.,* 254 NY 60; *Matter of Green v Ferguson,* 43 AD2d 1006); compensation is computed based on the time during which the guards work at the district (see *Matter of Peck v Tassell & Fairbanks,* 193 App Div 604; *Matter of Grigoli v Nito,* 11 AD2d 581; see, also, Restatement, Agency 2d, § 220); and they do not seem to work at any other job (cf. *Peer v Babcock,* 230 NY 106; *Matter of Breault v Central N. Y. Insulating Co.,* 282 App Div 904). Finally, the district can fire employees — if Star refuses to do so — by terminating the contract upon 30 days' notice to the contractor (see *Matter of Electrolux Corp.,* 288 NY 440; cf. *Matter of Conlin v Aiello,* 64 AD2d 921, affd 49 NY2d 713, *supra).* I cannot agree with my colleagues in the majority that direct supervision of the investigation of alarms and of traffic is merely incidental to Star's performance of its contract (cf. *Matter of Westchester County Civ. Serv. Employees Assn. v Cimino,* 58 AD2d 869, affd 44 NY2d 985, *supra).* Nor is the fact that

the guards are not more closely supervised during their patrols important since the nature of the work prevents closer supervision (see, e.g., *Matter of Friend [Audits & Surveys Co. — Ross]*, 64 AD2d 800). To me, it is an inescapable conclusion that the Chief and Captain were maintained in their positions, not merely to furnish a liaison with the contractor, but to provide supervision, direction and control of the work, as they did before. It follows, then, that the arrangement was created to circumvent civil service require-ments and to mask the district's employment of noncivil service personnel to defeat those requirements (see *Matter of Corwin v Farrell*, 303 NY 61, *supra*). Accordingly, I vote to affirm.